Clyde Walton HANKS, III, Appellant,

v.

Howard LaQUEY, Individually and as Next Friend of Barbara Jean LaQuey, a minor, Appellee.

No. 11563.

Court of Civil Appeals of Texas.

Austin.

Jan. 31, 1968.

Rehearing Denied Feb. 21, 1968.

Small, Herring, Craig, Werkenthin & Shannon, Bob E. Shannon, Austin, for appellant.

Brown, Brown & Bowen, Fred R. Brown, Garland, for appellee.

PHILLIPS, Chief Justice.

This case involves a railroad crossing accident between an automobile and a moving train. Two students from Southwestern University who were in the automobile were injured in the collision, both quite seriously.

The accident occurred in January, 1965 at about 11:45 p. m. in Georgetown at a point where 12th Street crosses the railway tracks. Appellant, Clyde Hanks, was driving the automobile also occupied by appellee Barbara LaQuey as guest-passenger, when the automobile, traveling easterly, struck a moving train at this crossing. Barbara and Clyde had been at Paul's Dairy Nook, a restaurant, near downtown and were en route back to the Southwestern University campus at the time of the wreck.

Both Barbara and Clyde were students at Southwestern University where she was a sophomore and he was a freshman. Their acquaintance was casual and came about largely because she had dated one of his fraternity brothers. They had not dated before the night of the accident. Because her regular date was unable to take Barbara out that night, Clyde called her to go over to his fraternity house. They double dated with another couple, but before they went to the fraternity house, they drove to Jarrell where Clyde bought a bottle of whisky. On the way back to Georgetown Barbara and Clyde had some drinks.

They arrived at the fraternity house at about 8:30 p. m. and remained there until about 11 or 11:30. Here they danced and played cards.

Barbara knew that during the course of the evening Clyde had drunk two or three mixed drinks, while she had about the same number. At about 11:15 or 11:30 she asked Clyde to take her out for something to eat and he borrowed a car and drove to Paul's Dairy Nook, a restaurant. At this time Barbara knew that Clyde had had at least two or three drinks.

The Dairy Nook was popular with the college students and Barbara and Clyde ordered food and stayed at this place some fifteen or twenty minutes. They left the Dairy Nook at about 11:45 p. m.

After they left the Dairy Nook, their plan was to return to the fraternity house where they would pick up another couple then return the girls to their dormitory. The closing time at the dormitory was 11:55, and if a girl was late, she would be penalized. Consequently, everyone tried to get their dates back into the dormitory on time. Barbara and Clyde had about ten minutes to get from the Dairy Nook to the fraternity house, pick up the other couple, and get to the girl's dormitory before it closed.

Clyde continued due east toward the railroad crossing. Before reaching the crossing, he overtook the automobile of Alfred Brown, the admissions counselor at Southwestern University, who was also returning to the campus with some students in his vehicle. Clyde was in the inside lane going east and so was the counselor. The evidence indicates that Clyde was speeding as he approached the counselor. When the counselor saw Clyde approaching he drove his automobile to his left, across the double yellow stripe to the wrong side of the road, in order to allow Clyde to pass. The counselor estimated Clyde's speed to be at least 70 miles per hour, perhaps as high as 90 miles per hour. The counselor had already observed a slow moving train blocking the 12th Street crossing before Clyde passed him. Clyde did not reduce his speed after passing the counselor, but continued speeding down 12th Street and hit the twenty-first car from the front of a twenty-nine car train. The car hit the rear wheels of the twenty-first car, stuck to the train, and was carried south with the train some 228

feet. The counselor did see the stop lights of the automobile come on an instant before impact. The police found that the car had skidded about 45 or 50 feet before striking the train. No one knows whether Clyde or Barbara applied the brakes at the last instant.

The train and crossing were not difficult to see. There was a street light at every block along 12th Street from Paul's Dairy Nook to the crossing, and a street light directly over the crossing that lighted the train itself. In addition, there were automobiles stopped on the east side of the crossing and their lights were plainly visible as the train was passing. Furthermore, the railroad had erected warning lights at the crossing that had four constantly burning red lights and two more that blinked on and off when a train was at the crossing.

12th Street was smooth and level and the six red warning lights at the railroad crossing could be seen all of the distance from Paul's Dairy Nook to the crossing itself.

The railroad crossing is in the 800 block of 12th Street. Between Paul's Dairy Nook and the crossing, there is a school zone in the 300 block; a hospital zone in the 500 block; a railroad warning sign in the 700 block; and a speed limit sign of 35 miles per hour.

Clyde had been a student at Southwestern University since September of 1964. He had been over the same railroad crossing many many times before the accident. He knew that 12th Street was the main street to get to and from Southwestern University. He knew all other students would be using it and was well aware of the speed limit. He readily agreed one could see trains using the crossing when still several blocks away if one were to look and agreed that trains using the crossing were not difficult to see.

Clyde further testified that before the accident he knew that there were warning lights at the railroad crossing.

Both Clyde and Barbara were severely injured in this collision and she remembers nothing after getting into the car at the Dairy Nook. He remembers taking a Spanish examination during the afternoon of the day of the wreck, and nothing afterwards for some weeks. Barbara was in the hospital for more than eight months after the accident. Included in the severe damage to her body was some facial disfigurement which may be permanent, her legs shortened by several inches and the inability to open her jaws more than a quarter of an inch. This latter feature can possibly be corrected by surgery accompanied by an interlude of painful exercises designed to keep the joints of the jaw from becoming fixed again. Before the accident, Barbara was a very attractive young lady, sought after by the boys, able in athletics, and was, in fact, the head of the athletic activities of her sorority. Now, the boys no longer call her and certain results of the accident will probably be with her for the rest of her life.

The jury found that Clyde failed to keep a proper lookout,[1] which was gross negli-

---

1. "SPECIAL ISSUE NO. 1: Do you find from a preponderance of the evidence that Clyde Walton Hanks, III failed to keep a proper lookout?

In connection with the foregoing special issue, you are instructed that 'proper lookout' means such lookout as a person of ordinary prudence in the exercise of ordinary care would have kept under the same or similar circumstances.

Answer 'Yes' or 'No.'

Answer: Yes

If you have answered Special Issue 1 yes, and only in that event, then answer:

SPECIAL ISSUE NO. 2: Do you find from a preponderance of the evidence that said failure to keep a 'proper lookout,' if you have so found, was gross negligence as herein defined?

Answer 'Yes' or 'No.'

Answer: Yes

If you have answered Special Issue No. 2 Yes, and only in that event, then answer:

SPECIAL ISSUE NO. 3: Do you find from a preponderance of the evidence that said gross negligence, if you have so

gence and a proximate cause of the collision; that he was driving at an excessive rate of speed, which was gross negligence and a proximate cause of the collision; that he failed to apply the brakes in time to avoid the collision, which was gross negligence and a proximate cause of the collision.

The court entered judgment for Barbara LaQuey against Clyde Walton Hanks, III

found, was a proximate cause of the collision in question?
    Answer 'Yes' or 'No.'
    Answer: Yes
SPECIAL ISSUE NO. 4: Do you find from a preponderance of the evidence that Clyde Walton Hanks, III was driving the automobile at an excessive rate of speed before the collision in question?
    In connection with the foregoing special issue, you are instructed that 'excessive rate of speed' means such rate of speed as a person of ordinary prudence in the exercise of ordinary care would not have driven under the same or similar circumstances.
    Answer 'Yes' or 'No.'
    Answer: Yes
If you have answered Special Issue No. 4 Yes, and only in that event, answer:
SPECIAL ISSUE NO. 5: Do you find from a preponderance of the evidence that driving the automobile at said excessive speed, if you have so found, was gross negligence as herein defined?
    Answer 'Yes' or 'No.'
    Answer: Yes
If you have answered Special Issue No. 5 yes, and only in that event, answer:
SPECIAL ISSUE NO. 6: Do you find from a preponderance of the evidence that said gross negligence, if you have so found, was a proximate cause of the collision in question?
    Answer 'Yes' or 'No.'
    Answer: Yes
SPECIAL ISSUE NO. 7: Do you find from a preponderance of the evidence that Clyde Walton Hanks, III failed to apply the brakes on the automobile in time to avoid the collision in question?
    Answer 'Yes' or 'No.'
    Answer: Yes
If you have answered Special Issue No. 7 yes, and only in that event, then answer:
SPECIAL ISSUE NO. 8: Do you find from a preponderance of the evidence that said failure, if you have so found, was gross negligence as herein defined?

based on the jury verdict in the amount of $150,748.06. It is from this judgment that appellant Hanks has perfected his appeal to this Court.

We affirm.

### I.

■ Appellant Hanks is before this Court on fifty points of error.[2] The first

    Answer 'Yes' or 'No.'
    Answer: Yes
If you have answered Special Issue No. 8 yes, and only in that event, then answer:
SPECIAL ISSUE NO. 9: Do you find from a preponderance of the evidence that said gross negligence, if you have so found, was a proximate cause of the collision in question?
    Answer 'Yes' or 'No.'
    Answer: Yes"

2. "1st Point: The error of the court in overruling defendant's motion to disregard Special Issues Nos. 2, 5 and 8, said special issues finding that the failure of the defendant to keep a proper lookout was gross negligence; that the driving by the defendant of the automobile at an excessive speed was gross negligence; and that the failure of the defendant to apply the brakes on the automobile in question in time to avoid the collision was gross negligence, for the reason that said issues have no support in the evidence and there is no evidence to raise such issues and to support the findings of the jury in that the uncontradicted and undisputed evidence established that the defendant was not guilty of gross negligence with respect to driving at an excessive rate of speed, failing to keep a proper lookout or failing to apply the brakes on the automobile which he was driving in time to avoid the collision.
2nd Point: The error of the court in overruling defendant's motion for judgment non obstante veredicto for the reason that the finding of the jury in answer to special issues inquiring as to the gross negligence of the defendant are wrong and should be held for nought because the undisputed and uncontradicted evidence established that the defendant was not guilty of gross negligence with respect to driving at an excessive rate of speed or failing to keep a proper lookout or failing to apply the brakes of the automobile which he was driving at such time

thirty-nine points, briefed together, complain of the trial court's action in entering judgment for the appellee Barbara LaQuey

for the reasons that there was either no evidence or insufficient evidence to support the jury's findings as to gross negli-

in order to avoid the collision; and because of such undisputed and uncontradicted evidence no issue of fact with respect to the gross negligence of the defendant was raised for submission to the jury and that a directed verdict for the defendant would have been proper and should have been given.

3rd Point: The error of the court in overruling the defendant's motion for directed verdict for the reason that the undisputed and uncontradicted evidence established that defendant was not guilty of gross negligence with respect to driving at an excessive rate of speed or failing to apply the brakes of the automobile which he was driving at such time in order to avoid the collision or failing to keep a proper lookout, and because of such undisputed and uncontradicted evidence no issue of fact with respect to gross negligence of this defendant was raised for submission to the jury.

4th Point: The error of the court in the submission of the definition of gross negligence in that the court's definition failed to include the element that the acts or omissions complained of must be of a continuous or persistent nature and the proper definition of gross negligence should have been as follows: 'By gross negligence as used in this charge is meant more than momentary thoughtlessness, inadvertence or error in judgment. There must be an etire want of care to raise the belief or presumption that the act or omission complained of was the result of conscious indifference to the rights, welfare or safety of the person affected by it. There must be something of a continued or persistent course of action.'

5th Point: The error of the court in submitting Special Issue No. 1 to the jury for the reason that there was no evidence that the defendant failed to keep a proper lookout so as to raise the issue.

6th Point: The jury's answer to Special Issue No. 1 was contrary to the great weight and preponderance of the evidence.

7th Point: There was no evidence to support the jury's answer to Special Issue No. 1.

8th Point: The error of the court in submitting Special Issue No. 2 to the jury since there was no evidence to raise the issue that defendant was guilty of gross negligence with respect to failing

to keep a proper lookout, and the uncontradicted and undisputed evidence established that defendant was not guilty of gross negligence in failing to keep a proper lookout.

9th Point: The error of the court in submitting Special Issue No. 2 to the jury for the reason that there was insufficient evidence of gross negligence on the part of the defendant to warrant or support the submission thereof.

10th Point: The jury's answer to Special Issue No. 2 had no support in the evidence because there was no evidence to support Special Issue No. 2 in that the uncontradicted and undisputed evidence established that the defendant was not guilty of gross negligence in failing to keep a proper lookout.

11th Point: The jury's answer to Special Issue No. 2 was contrary to the great weight and preponderance of the evidence.

12th Point: The error of the court in submitting Special Issue No. 3 to the jury for the reason that there was no evidence to raise said issue.

13th Point: The error of the court in submitting Special Issue No. 3 to the jury for the reason that there was insufficient evidence to warrant the submission of said issue.

14th Point: There was no evidence to support the jury's answer to Special Issue No. 3.

15th Point: The jury's answer to Special Issue No. 3 was contrary to the great weight and preponderance of the evidence.

16th Point: The error of the court in submitting Special Issue No. 4 to the jury for the reason that there was no evidence to raise such issue.

17th Point: The error of the court in submitting Special Issue No. 4 to the jury for the reason that there was insufficient evidence to suport or warrant the submission of this issue.

18th Point: There was no evidence to support the jury's answer to Special Issue No. 4.

19th Point: The jury's answer to Special Issue No. 4 was contrary to the great weight and preponderance of the evidence.

20th Point: The error of the court in submitting Special Issue No. 5 to the jury for the reason that there was no evidence to raise such issue and no evidence to support such findings of the jury in

gence on the part of appellant Hanks with respect to failure to keep a proper lookout, to driving at an excessive rate of speed and his failure to apply his brakes in time to avoid the collision. That the findings with respect to these alleged acts of neg-

that the uncontradicted and undisputed evidence established that the defendant was not guilty of gross negligence in driving at an excessive rate of speed.

21st Point: The error of the court in submitting Special Issue No. 5 to the jury for the reason that there was insufficient evidence to raise the issue of gross negligence with respect to excessive speed.

22nd Point: There was no evidence to support the jury's answer to Special Issue No. 5 in that the uncontradicted and undisputed testimony established that the defendant was not guilty of gross negligence with respect to driving at an excessive rate of speed.

23rd Point: The jury's answer to Special Issue No. 5 was contrary to the great weight and preponderance of the evidence with respect to the finding that the rate of speed at which defendant was driving was gross negligence.

24th Point: The error of the court in submitting Special Issue No. 6 to the jury for the reason that there was no evidence to raise such issue.

25th Point: The error of the court in submitting Special Issue No. 6 for the reason that there was insufficient evidence to support or warrant the submission of this issue.

26th Point: There was no evidence to support the jury's answer to Special Issue No. 6.

27th Point: The jury's answer to Special Issue No. 6 was contrary to the great weight and preponderance of the evidence.

28th Point: The error of the court in submitting Special Issue No. 7 to the jury for the reason that there was no evidence to warrant or support the submission of this issue.

29th Point: The error of the court in submitting Special Issue No. 7 to the jury for the reason that there was insufficient evidence to warrant or support the said submission.

30th Point: There was no evidence to support the jury's answer to Special Issue No. 7.

31st Point. The jury's answer to Special Issue No. 7 was contrary to the great weight and preponderance of the evidence.

32nd Point: The error of the court in submitting Special Issue No. 8 for the reason that there was no evidence to raise such issue and no evidence to support such issue, in that the uncontradict-

ed and undisputed evidence established that the defendant was not guilty of gross negligence with respect to failing to apply the brakes on the automobile which he was driving in time to avoid the collision.

33rd Point: The error of the court in submitting Special Issue No. 8 to the jury for the reason that there was insufficient evidence of gross negligence with respect to the defendant's failing to apply the brakes on the automobile which he was driving in time to avoid the said collision.

34th Point: There was no evidence to support the jury's answer to Special Issue No. 8 in that there is no evidence to raise such issue and no evidence to support such a finding of the jury in that the uncontradicted and undisputed evidence established that the defendant was not guilty of gross negligence with respect to failure to apply the brakes on the automobile which he was driving in time to avoid the collision.

35th Point: The jury's answer to Special Issue No. 8 was contrary to the great weight and preponderance of the evidence with respect to the jury's finding that the defendant was guilty of gross negligence in failing to apply the brakes on the automobile which he was driving in time to avoid the collision.

36th Point: The error of the court in submitting Special Issue No. 9 for the reason that there was no evidence to raise this issue.

37th Point: The error of the court in submitting Special Issue No. 9 for the reason that there was insufficient evidence to warrant the submission of said issue.

38th Point: There was no evidence to support the jury's answer to Special Issue No. 9.

39th Point: The jury's answer to Special Issue No. 9 was contrary to the great weight and preponderance of the evidence.

40th Point: The error of the court in refusing to submit defendant's requested special issues inquiring whether Barbara LaQuey's request that the defendant take her in an automobile to get something to eat, with the knowledge that he had been drinking intoxicating liquor, was negligence and a proximate cause of the injuries.

41st Point: The error of the court in refusing to submit defendant's requested

ligence were against the great weight and preponderance of the evidence, and further that the definition of gross negligence used by the court, and stated later in this opinion, was incorrect.

We overrule these points.

This case is governed by the Guest Statute, Tex.Rev.Civ.Stat.Ann. art. 6701b,[3]

which provides in substance that a guest may recover only if his injury was intentional or caused by the host's heedlessness or reckless disregard of the rights of others.

In argument before this Court and in his exhaustive brief filed with us, able counsel for the appellant has urged that the host's

special issues inquiring whether Barbara LaQuey's riding in the automobile with the defendant with the knowledge that the defendant had been drinking intoxicating liquor was negligence and a proximate cause of her injuries.

42nd Point: The error of the court in permitting plaintiff's counsel to ask defendant, over objection that the answer called for a legal conclusion, whether he subscribed to the proposition that one is reckless if he drives a car so fast that he can not stop when he knows he is approaching a train crossing.

43rd Point: The error of the court in permitting plaintiff's counsel to ask defendant, over objection that the answer called for a legal conclusion, whether the defendant felt that speeding was wrong.

44th Point: The error of the court in permitting plaintiff's counsel to ask defendant, over objection that the answer called for a legal conclusion, whether he would have been consciously aware that traveling 60 to 90 miles an hour along 12th Street at about 11:45 o'clock on a Friday night was involving an extremely high probability that someone would get hurt.

45th Point: The error of the court in permitting plaintiff's counsel to ask defendant, over objection that the answer called for a legal conclusion, whether the speeding in question was mere inadvertence and error in judgment.

46th Point: The error of the court in permitting witness Manning to testify over objection of defendant's counsel as to the number of blocks that a car spun out of the Dairy Nook between the hours of 11:00 and 12:00 p. m., in that the witness never saw the car involved; the witness admitted that it was only guesswork on his part with reference to how far the car actually spun out; and the witness did not know that the car which spun out from the Dairy Nook was the same car that was in the wreck.

47th Point: The error of the court in overruling defendant's objection to the testimony of Officer Nobles as to the distance down 12th Street from which one

could see flashing lights at the railroad tracks, when on cross-examination the witness admitted that such distance testimony was but a guess on his part.

48th Point: The error of the court in ruling inadmissible the question concerning Alfred Brown's qualification to judge speed, 'Of course, you are not in the business of judging speed. You are a school administrator, I suppose.', at which point the court terminated the voir dire examination of Brown and permitted Brown to give his opinion of the speed of defendant's car.

49th Point: The error of the court in refusing to permit defendant's counsel to cross-examine the witness Alfred Brown with reference to his prior statement concerning the speed of the defendant's car as being as low as 40 miles an hour.

50th Point: The error of the court in refusing to submit the defendant's requested special issues inquiring whether or not the collision made the basis of the suit was the result of an unavoidable accident."

3. "Art. 6701b.   Liability for injuries to gratuitous guest in motor vehicle limited; public carrier and motor vehicle demonstrators excepted

Section 1.   No person transported over the public highways of this State by the owner or operator of a motor vehicle as his guest without payment for such transportation, shall have a cause of action for damages against such owner or operator for injuries, death or loss, in case of accident, unless such accident shall have been intentional on the part of said owner or operator, or caused by his heedlessness or his reckless disregard of the rights of others.

Sec. 2.   This Act shall not relieve a public carrier or any owner or operator of a motor vehicle while the same is being demonstrated to a prospective purchaser, of responsibility for any injuries sustained by a passenger being transported by such public carrier, or by such owner or operator.   Acts 1931, 42nd Leg., p. 379, ch. 225."

mental attitude as manifested by his words and actions in respect to his conduct is vitally important in distinguishing between facts constituting ordinary negligence and those constituting gross negligence and that the absence of this factor is fatal to the guest's case. Here it was emphasized that Barbara and Clyde were friends, that there is no direct evidence of any enmity or pique between them. In addition, counsel points out that the courts have consistently held that an accident caused by the host's excessive speed, failure to keep a proper lookout, or failure to apply the brakes are acts of ordinary negligence and do not in themselves constitute gross negligence. [4]

In addition, appellant cites cases such as Kirkpatrick v. Neal, 153 S.W.2d 519, (Tex. Civ.App. Beaumont 1941, writ ref'd, w. o. m.) where the host defendant was held to be grossly negligent. Here it was shown that his frame of mind was one of anger and frustration in that his companion guest had spurned his proposal of marriage. Rogers v. Blake, 150 Tex. 373, 240 S.W.2d 1001 (1951) where the court exonerated the host defendant of gross negligence merely for failure to stop at a stop sign. Gill v. Minter, 233 S.W.2d 585 (Tex.Civ.App. San Antonio 1950, writ ref'd) where the Court exonerated a youthful speedster from gross negligence and called his act one of momentary thoughtlessness or mistake in judgment. Webb v. Karsten, footnote No. 4, below, where in addition to the fact that the Court held that was insufficient proof as to who had actually driven the car, the only allegation of negligence was excessive speed.

We have no quarrel with these cases and under their facts they are correct. Here we have different facts, a course of conduct established well enough by the evidence to raise inferences that allowed the jury to find as they did.

We hold that this case is controlled by the opinions of the Supreme Court in Bowman v. Puckett, 144 Tex. 125, 188 S.W.2d 571 (1945) and in Fancher v. Cadwell (1958), 159 Tex. 8, 314 S.W.2d 820 wherein Bowman v. Puckett is cited with approval.

In *Bowman* the facts are strikingly similar to those of the case at bar. The Court said:

"It is our opinion that the facts in evidence, including the speed greatly in excess of that permitted by the statute, the place, a heavily traveled highway and an important residence and business street of a city having a population of more than 6,000, the condition of the automobile, that is, the defective brakes, and respondent's knowledge of that condition, tend strongly to prove that respondent was acting in a heedless and reckless disregard of the rights of others, or, stated in the language of the approved definition of gross negligence, that his act in driving at that rate of speed, under the circumstances, was the result of a conscious indifference to the rights or welfare of the person or persons to be affected by it. Missouri Pacific Ry. Co. v. Shuford, 72 Tex. 165, 10 S.W. 408.

[4] Whether the act of respondent was of that character is determined by

4. Gill v. Minter, 233 S.W.2d 585 (Tex.Civ. App. San Antonio 1950, writ ref'd); Wood v. Orts, 182 S.W.2d 139 (Tex.Civ. App. Houston 1957, no writ); Mayer v. v. Karsten, 308 S.W.2d 114 (Tex.Civ. App. Houston 1957, no writ); Mayer v. Johnson, 148 S.W.2d 454 (Tex.Civ.App. Amarillo 1941, writ dism. judg. cor.); Rowan v. Allen, 134 Tex. 215, 134 S.W.2d 1022 (1940); Bruton v. Shinault, 314 S.W.2d 143 (Tex.Civ.App. Waco 1958, no writ); Schafer v. Stevens, 352 S.W.2d 471 (Tex.Civ.App. Dallas 1961, no writ); Rice v. Simmons, 356 S.W.2d 206 (Tex. Civ.App. Amarillo 1962, no writ); Montgomery v. Campbell, 362 S.W.2d 658 (Tex.Civ.App. San Antonio 1962, writ ref'd, n. r. e.); Farney v. Herr, 358 S.W. 2d 758 (Tex.Civ.App. Fort Worth 1962, no writ); Linn v. Nored, 133 S.W.2d 234 (Tex.Civ.App. Austin 1939, writ dism'd judg. cor.); Glassman v. Feldman, 106 S.W.2d 721 (Tex.Civ.App. Amarillo 1937, no writ).

inference from what respondent did and the physical facts that existed at the time and that contributed to the accident. Scott v. Gardner, 137 Tex. 628, 636, 156 S.W.2d 513, 141 A.L.R. 50; Munves v. Buckley, Tex.Civ.App., 70 S.W.2d 605; Frazer v. Brannigan, 228 Iowa 572, 293 N.W. 50; Bushnell v. Bushnell, 103 Conn. 583, 131 A. 432, 44 A.L.R. 785. We believe that the inference drawn by the trial court from the evidence in the record as to those facts is, at least, a reasonable inference.

[5] The 'conscious indifference' included in the definition of gross negligence is indifference 'to the rights or welfare of the person or persons to be affected by it (the act or omission).' Missouri Pacific Ry. Co. v. Shuford, 72 Tex. 165, 10 S.W. 408, 411; Texas Pacific Coal & Oil Co. v. Robertson, 125 Tex. 4, 79 S.W.2d 830, 98 A.L.R. 262. The persons who would or might be affected by respondent's reckless driving were not only the occupants of his automobile but also persons who might be traveling on the street or highway or who might enter upon it. The probability of danger to all such persons 'must be considered in determining whether negligence exists, as well as the grade.' International & Great Northern R. Co. v. Cocke, 64 Tex. 151, 157.''

We have no question of known defective brakes in our case so if we delete this feature and simply substitute the facts that Clyde being a resident on the campus at Southwestern University was conscious of the fact that he was speeding, not only on a State highway, but on an extensively traveled city street which was intersected by many other city streets, along an area where residences, hospitals and schools existed, the remaining facts in *Puckett* are practically identical. Furthermore he was speeding toward a railroad crossing along which he knew trains would be expected. He

totally ignored the other traffic, he totally ignored the posted speed limit, he totally ignored the signs warning of the hospital zone, he totally ignored the railroad crossing sign on the block prior to the crossing and totally ignored six red lights, two of them flashing,[5] at the railroad crossing, even though these lights were visible the entire distance from Paul's Dairy Nook to the crossing. In addition, Clyde ignored the moving train itself and the headlights from cars stopped on the east side of the train which lights could be seen shining between and under the cars. Thus we have, in our opinion, a stronger set of facts for gross negligence here than were those in Bowman v. Puckett.

Appellant points us to the sixty-odd feet of skidmarks left by Clyde's car before he struck the train as an indication that Clyde did everything possible to avert the crash thus obviating the heedlessness and lack of concern necessary. We do not agree. We hold that the facts above give rise to inferences of such heedlessness and lack of concern even though, when too late, Clyde may have attempted to reverse his chosen course. It has never been held that suicide is a necessary element of gross negligence. In this connection it should be pointed out that the host driver in Bowman v. Puckett, supra, also attempted to avoid the accident and skidmarks were present, however, he too, in ignoring a series of warnings that an ordinary prudent person would have noticed and heeded, had already set in motion a force created by his heedlessness and lack of concern that he was unable to halt.

With respect to appellant's contention that conduct to be characterized as gross negligence must be persistent or continuing in its course as distinguished from momentary, we cite Fancher v. Cadwell, supra, where the host defendant backed his car from a driveway into the path of an oncoming car. The testimony here was that the series of events took from a minute and a half to three minutes. In holding the host defend-

---

5. There is no direct evidence that the lights were flashing at the time of the accident.

ant liable for gross negligence, the Supreme Court cited Bowman v. Puckett with approval and reiterated: "The question of whether the acts or omissions were the result of a conscious indifference to the rights or welfare of the person or persons to be affected by such acts is determined by inference from what the actor did and the physical facts that existed at the time and that contributed to the accident, citing cases."

■ We also overrule appellant's objection to the court's definition of gross negligence for failing to include the element that the acts or omissions complained of must be of a continuous or persistent nature. In submitting this question to the jury, the court used the same wording approved by the Supreme Court in Fancher v. Cadwell.

## II.

Appellant's fortieth and forty-first points of error, briefed together, are those of the court in refusing to submit appellant's requested special issues inquiring whether Barbara's request that the defendant take her in an automobile to get something to eat, with the knowledge that he had been drinking intoxicating liquor, was negligence and a proximate cause of the injuries; in refusing to submit appellant's requested special issues inquiring whether Barbara's riding in the automobile with appellant with the knowledge that he had been drinking intoxicating liquor was negligence and a proximate cause of her injuries.

We overrule these points.

■ It is fundamental that only issues raised by the evidence need be submitted to the jury. The question controlling here was not whether appellant had taken several drinks during the course of the evening but whether or not he was intoxicated. There is no evidence in the record of either party to this appeal being intoxicated. 57

Tex.Jur.2d, Sufficiency of Evidence, Sec. 453.

Appellant's points of error forty-two through forty-five, briefed together, are those of the trial court in permitting appellee to answer questions over objection that the answer called for a legal conclusion, such as whether he subscribed to the proposition that one is reckless if he drives a car so fast that he cannot stop when he knows he is approaching a train crossing; whether appellant felt that speeding was wrong; whether he would have been consciously aware that traveling 60 to 90 miles an hour along 12th Street at about 11:45 o'clock on a Friday night was involving an extremely high probability that someone would get hurt; whether the speeding in question was mere inadvertence and error in judgment.

We overrule these points.

■ The evidence in this record preponderates beyond the shadow of a doubt to the effect that appellant was driving at a reckless rate of speed at the time the accident occurred. The questions objected to call for answers which are no more than platitudes with which we may all agree and which in themselves, if error, were harmless. Tex. Rules of Civil Procedure, rule 434.

Points of error forty-six and forty-seven, briefed together, are those of the court in permitting witness Manning to testify over objection of defendant's counsel as to the number of blocks that a car spun out of the Dairy Nook between the hours of 11:00 and 12:00 p. m., in that the witness never saw the car involved; the witness admitted that it was only guesswork on his part with reference to how far the car actually spun out; and the witness did not know that the car which spun out from the Dairy Nook was the same car that was in the wreck; the error of the court in overruling defendant's objection as to the distance down 12th Street from which one could see flashing lights at the railroad tracks, when

on cross examination the witness admitted that such distance testimony was but a guess on his part.

We overrule these points.

■ Manning's testimony here was merely cumulative of testimony to the same effect by witness Klepak who testified that he actually saw appellant start with his tires squealing and skidding for quite a long distance. If it was error, and we do not think it was, to admit Manning's testimony to the same effect because he merely heard and did not see the car, it was harmless error.

■ Officer Nobles' testimony as to the distance that the warning light could be seen was an estimate of a qualified witness where the witness had disclosed knowledge of the subject matter derived from observation or experience. 23 Tex.Jur.2d, Distance and space, Sec. 468; Texas Law of Evidence, McCormick & Ray, Section 1436.

Appellant's points of error forty-eight and forty-nine, briefed together, are the errors of the court in ruling inadmissible the question concerning Alfred Brown's qualification to judge speed "Of course, you are not in the business of judging speed. You are a school administrator, I suppose," at which point the court terminated the voir dire examination of Brown and permitted Brown to give his opinion of the speed of defendant's car; the error of the court in refusing to permit defendant's counsel to cross-examine the witness Alfred Brown with reference to his prior statement concerning the speed of the defendant's car as being as low as 40 miles an hour.

We overrule these points.

■ Witness Brown's estimate of speed was permissible testimony for the same reasons that Officer Nobles' testimony was allowed, supra.

The witness, Alfred Brown, testified that he could estimate the speed of the defendant's automobile as it passed by him and did estimate the speed at 70 miles per hour. He further stated it could have been faster or slower, as little as 60 or as high as 90, but that his best estimate would be at least 70 miles per hour. Defense counsel commenced his cross examination by showing Brown a statement that he had signed a considerable period of time prior to the trial date. The statement had been written by somebody other than Brown. This statement was marked as defendant's Exhibit No. One, and defense counsel was thereupon permitted to read the statement in its entirety to the jury. The statement was initialed and signed by Brown and indicated that he told the person taking the statement at that time that he could not estimate the speed of the car except that it was traveling over 40 miles per hour in his opinion and that it seemed extremely fast and that it was hard for him to estimate because of the conditions. Defense counsel attempted to have Brown testify that at the time he signed the statement that he actually felt that the speed was over 40 but that he could not estimate the speed. Brown stated that he did not remember giving the statement and, of course, could not recall what he was thinking about at that time. He did admit that the statement contained his initials and signature and did not deny reading it although he could not now recall reading it.

■ Thereupon, defense counsel asked Brown if he had not stated in defendant's Exhibit No. One, which had just been read to the jury, that he could not give an opinion as to the speed of the car other than it was going over 40 miles per hour. Plaintiff's counsel objected that the statement spoke for itself and was the best evidence. The objection was sustained. Whereupon, defense counsel asked Brown whether at the time he gave the statement, he had felt that the defendant's speed could be as low as 40 miles per hour. The court sustained plaintiff's objection that this was repetitious and had been gone into before.

It was for the jury to determine the speed of the car from the facts and inferences to be drawn therefrom.

Appellant's fiftieth point of error is that of the court in refusing to submit the appellant's requested special issues inquiring whether or not the collision made the basis of the suit was the result of an unavoidable accident.

We overrule this point.

Appellant contends that, if raised by the evidence, the issue of unavoidable accident must be submitted to the jury, citing Dallas Ry. & Terminal Co. v. Garrison, 45 S.W.2d 183 (Tex.Com.App.1932). Appellant further contends that evidence of blinding lights has been held to raise the issue of unavoidable accident citing Bransford v. Pageway Coaches, 129 Tex. 327, 104 S.W. 2d 471 (1937) among other cases. He contends further that evidence of an obstacle that might obstruct the view of the driver has been held to raise such issue citing Rodman Supply Co. v. Jones, 370 S.W.2d 951 (Tex.Civ.App. Amarillo 1963) among other cases.

The Supreme Court has defined unavoidable accident as an event not proximately caused by the negligence of any party to it. Dallas Railway & Terminal Company v. Bailey, 151 Tex. 359, 250 S.W.2d 379 (1952).

There is no evidence in this case that something other than the negligence of appellant caused the accident. Consequently, the question of unavoidable accident is not raised. Hicks v. Brown, 136 Tex. 399, 151 S.W.2d 790 (Tex.Com.App. 1941).

### III.

By cross assignment of error, appellee complains of the court in refusing to admit in evidence the driving record of appellant as well as that of his step-brother, Owen Fuller Thornton.

Prior to the commencement of trial, appellant filed his motion in limine with respect to appellant's and his step-brother's record of traffic violations and automobile collisions. Appellant's driving record disclosed that since 1961 he has been convicted of accident with a fixed object, negligent collision, motor vehicle accident, operating a motor vehicle without a valid operator's license, motor vehicle accident, negligent collision, ran red light, speeding, speeding, ran boulevard stop sign, speeding, defective lights, accident with fixed object, negligent collision, speeding, motor vehicle accident, driving on wrong side of street, accident with train, failure to control speed (these latter two convictions were relative to the accident before us). After the accident here in question appellant was convicted of speeding on two further occasions. Appellant's operator's license was suspended in 1962, in 1964, in March of 1965 after the accident in question and the suspension was continued in July of 1965. Appellant's license was suspended at the time of the accident.

Appellant's brother has a record almost as flagrant and was injured when he too ran a motor vehicle into a train and is presently in the State hospital.

In view of the disposition we have made of this case we do not deem it necessary to pass upon this question.

The judgment of the trial court is affirmed.

Affirmed.